[No. 63994-3-I.   Division One.   March 21, 2011.]

DENISE FRISINO, *Appellant*, v. SEATTLE SCHOOL DISTRICT NO. 1, *Respondent*.

---

*Philip A. Talmadge* and *Sidney C. Tribe* (of *Talmadge/Fitzpatrick*); *John C. Montoya* (of *Law Office of John C. Montoya PLLC*); and *Patrick B. Reddy* (of *Emery Reddy PLLC*), for appellant.

*Patricia K. Buchanan* and *Daniel P. Crowner* (of *Patterson Buchanan Fobes Leitch & Kalzer Inc.*), for respondent.

¶1 APPELWICK, J. — Frisino, a teacher, exhibited sensitivity to environmental factors in her workplace, constituting a disability under the Washington Law Against Discrimination, chapter 49.60 RCW. She appeals the trial court's grant of summary judgment disposing of her claims of employment discrimination against her employer school district based on failure to accommodate her disability and retaliatory discharge. Questions of material fact remain as to whether the district accommodated Frisino's disability and, if not, whether Frisino communicated that to the district. We reverse.

## FACTS

¶2 Denise Frisino alleges that she acquired a respiratory illness in response to chemical toxins in the school environment when she worked at Hamilton International Middle School, making her sensitive to airborne toxins, dust, mold, and other irritants. Frisino first began to experience respiratory symptoms in the 1999-2000 school year. Between

that time and 2004, Seattle School District No. 1 (District) attempted several accommodations, including providing an air filter, ordering Hamilton custodians to mop her classroom floor twice a week, and moving her to a different classroom. In April 2004, Frisino's primary care physician, Dr. Fernando Vega, diagnosed Frisino with respiratory sensitivity to molds, chemicals, and other environmental toxins. Frisino went on medical leave. In May 2004, Vega informed the District that Frisino needed to be placed in a "clean environment next year." In August 2004, Frisino agreed to be transferred to Nathan Hale High School (Hale). Frisino alleges that she accepted the transfer only to escape Hamilton, that she did not visit her new classroom before accepting the transfer, and that when she entered her new classroom before school began she immediately noted visible mold as well as blackened and missing ceiling tiles.[1]

¶3 In September 2004, Frisino discussed her health problem with Hale Principal Lisa Hechtman. Hechtman alleges that she recommended that Frisino move to a portable classroom and Frisino declined. Also, in September and October, both a private firm, Clayton Group Services, and the Seattle/King County Department of Health investigated Hale and reported no active mold growth in the building. Clayton Group also conducted air sampling tests and reported that the total fungal structure concentrations inside the Hale building were lower than those found outdoors. The District performed additional air testing, determining that areas in Frisino's classroom and adjacent classrooms were dry and would not support mold growth. But, the District decided to reencapsulate areas where there was visible mold, including the northeast stairwell, Frisino's classroom, and other rooms.

¶4 Meanwhile, Frisino requested an accommodation in the form of a move to another classroom but declined the

---

[1] These facts are disputed by the District, which asserts that she did view the classroom before accepting the position.

two options offered by the District. On November 21, Frisino left work complaining of respiratory distress and went to the emergency room. Frisino did not return to work. On November 30, Vega sent a note supporting Frisino's request for "time off work until remediation of environmental conditions at Nathan Hale."

¶5 About the same time, the District hired GlobalTox, an industrial hygiene and toxicology consultant. GlobalTox and the District scheduled a walk-through of the building with certain members of the public on November 30 to evaluate the condition of the Hale environment. GlobalTox issued a report on December 3 declaring that the situation at Hale was not an emergency, generally safe for most students, and only a danger to those with "the most severe forms of immunocompromise." In accordance with the recommendations of GlobalTox, the District pursued partial remediation in December, over winter break, to remove visible mold. It completed the project over the summer by removing ceiling tiles to search for additional mold, removing any revealed mold, and replacing stained ceiling tiles. In December, the District hired Superior Coit, who it alleges removed the small amounts of visible mold from classroom 216 and other areas. Superior Coit alleges it removed less than five square feet of mold from Hale.[2]

¶6 After the completion of the December phase of the remediation project, the District notified Frisino that her classroom had been remediated and that she should return to work on January 3, 2005. She refused.

¶7 As a result of Frisino's industrial insurance claim, she participated in an independent medical examination (IME)

[2] On January 5, 2005, Dr. David Anderson, a toxicologist and director of Children's Indoor Environmental Health Society, who had attended the GlobalTox walk through, sent a letter to a school board director, critiquing the GlobalTox method and conclusions. Anderson noted that no additional testing was performed after the first GlobalTox walk through. (Anderson later served as Frisino's expert in litigation.) But, Eric Tabb of the Washington State Department of Labor and Industries (L&I) inspected the project during construction and concluded in a March 14 report that "[t]he exploration, penetration and removal process was done according to an EPA [Environmental Protection Agency] Class II protocol" and that the removal "was found to be satisfactory in its execution."

with Dr. Dorsett Smith.[3] On January 18, 2005, Smith issued a report and diagnosed Frisino with "multiple chemical sensitivity syndrome," defined as a mental illness that causes a fixation on dust, chemical exposure, or any fumes or odors in the workplace. Smith recommended a work space with good ventilation, no evidence of odors or strong chemical smells including cigarette smoke, perfume, cleaning agents, animal dander, or dust. Smith also recommended that Frisino return to work and continue to meet with a psychiatrist or psychologist. Smith concluded that "[n]one of the diagnoses listed above are related to any work-related conditions."[4] The District received the results of this IME and relied on it prior to termination.[5]

¶8 The District and Frisino continued to communicate over a period of several months. On January 19, 2005, Frisino e-mailed the District and asked for an update on the remediation. Richard Staudt, the District's manager of risk and loss, replied that day:

> I believe the work done over the break fully addressed the issues Dr. Vega identified in his letter of 11/30 and I have not seen anything new from him that would require you to be out of the building since January 3.

On January 20, Staudt again told Frisino in an e-mail:

> The Nathan Hale environment was modified to address the irritant over the winter break, so I would believe it was appropriate for you to return to work there as of 1/3/05.

---

[3] Frisino filed a claim with L&I requesting worker's compensation. Much of the medical diagnoses and testing referred to in this case was performed in response to Frisino's L&I claim.

[4] On January 25, 2005, Frisino's own pulmonary specialist, Dr. Jeffrey Cary, issued a report after reviewing Smith's report. Cary disagreed with Smith's conclusion that the illness was not work related, but agreed that "the patient needs to be in a clean environment and away from irritants."

[5] On January 14, 2005, Dr. Douglas Robinson completed an independent psychiatric evaluation (IPE) of Frisino at the request of L&I, but the District did not receive the results of this IPE until discovery in this case.

¶9 On February 1, Frisino wrote Rick Takeuchi, the District's equal employment opportunity manager, explaining:

On 12/21/04, Dr. Cary signed the attached letter stating that I could return to work, but not to the old environment. I need to avoid respiratory irritations and temperature extremes.

Room 216, my classroom, was not completely remediated. There are still water stained tiles that the District painted over. Painting is not acceptable as remediation by any health organization. In the area where work was done, the ceiling tiles have been removed, a compound was applied to an area about one foot-square and there is a hole covered with plastic and blue duct tape. The plastic moves up and down, indicating air movement from within the crawl space. This creates potential for spores to move through my classroom.

. . . .

For now, a high school environment that is newer, good ventilation, free of fragrances, clean with no heat extremes would be best.

On February 7, the District again demanded that Frisino return to work or submit an accommodation request. On February 10, Frisino submitted a revised accommodation request:

I am requesting to be placed in a different Building until Nathan Hale is completely remediated. There is stachybotrys mold (and others) in the school and my classroom. These are high concentrations and I have a severe reaction to them. I will need a room with good ventilation – no perfumes, gas, etc. and not extreme temperature changes. A window to outside.

Vega's health care provider statement supported her request:

[Frisino is s]ensitive to her environment at work.

. . . .

The accommodation recommendation is to have Ms. Frisino transferred to a site that is mold free.

On February 11, Frisino e-mailed Staudt:

> This is my second e[-]mail requesting a simple answer. Is it Okay for me to go back to work in room 216 at Hale?

Staudt replied that day:

> Repeatedly since January 4, I have told you that it is okay for you to return to your classroom. I am not sure how to make it any more clear.

¶10  On March 3, Frisino wrote to Margo Holland, manager of Seattle Public Schools Employment Services, requesting placement:

> It is important for me to work. In fact, since January 3, 2005, I have kept in contact with my Principal, prepared lesson plans, corrected papers, wrote letters to each of my students, met with students after school and on weekends, and contacted several parents.

On March 11, Vega wrote the District:

> Ms. Frisino has ongoing issues with environmental irritants, presumably mold related, that are present in her work environment. She is advised to remain away from her current workplace or be transferred to a more accommodating environment.

On April 4, Takeuchi responded to Vega, explaining that the District's expert reports showed that mold spores enter from outdoor air and that testing showed that the indoor spores of mold were not above normal. He then asked Vega:

> Since the District is unable to provide a mold-free environment, the District would like to have your medical opinion as to what type of modifications can be made that would allow Ms. Frisino to work in her current worksite. At this point in time neither Ms. Frisino nor her health care providers have recommended any type of modifications that can be made in her worksite that would accommodate her disability, other than to say that she needs a mold-free environment, which the District is not able to provide as documented by the environmental reports.

Vega responded on April 20:

> At this point Ms. Frisino's disability does not allow her to work at her current site and furthermore, it does not appear that modifications could be easily done to allow her to do so, given the reports on the conditions there. I recommend that she be relocated to a known "clean" environment and see how she responds.

On April 25, the District notified Frisino that it was unable to grant her request to be transferred from Hale. Finally, the District terminated Frisino on June 1 for "failure to return to [her] position." That summer, the District completed the mold remediation project at Hale.

¶11 Frisino filed a notice of claim and subsequent lawsuit against the District, alleging failure, from November 30, 2004 through the end of her employment, to provide a reasonable accommodation as required by the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW; employment discrimination in violation of WLAD; retaliatory discharge; and intentional infliction of emotional distress. The trial court granted summary judgment in favor of the District. Frisino appeals.

## DISCUSSION

I. <u>Standard of Review</u>

¶12 A motion for summary judgment presents a question of law reviewed de novo. *Osborn v. Mason County*, 157 Wn.2d 18, 22, 134 P.3d 197 (2006). A trial court grants summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. CR 56(c). We construe the evidence in the light most favorable to the nonmoving party. *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). We review a ruling on a motion for summary judgment based solely on the record before the trial court at the time of the motion for summary judgment. RAP 9.12; *Wash. Fed'n of State Emps., Council 28 v. Office of Fin. Mgmt.*, 121 Wn.2d 152, 163, 849 P.2d 1201 (1993). An adverse party may not rest upon mere allegations or denials but must instead set

forth specific facts showing the existence of a genuine issue for trial. CR 56(e); *McBride v. Walla Walla County*, 95 Wn. App. 33, 36, 975 P.2d 1029, 990 P.2d 967 (1999).

¶13 In discrimination cases, summary judgment is often inappropriate because the WLAD "mandates liberal construction." *Martini v. Boeing Co.*, 137 Wn.2d 357, 364, 971 P.2d 45 (1999); RCW 49.60.020. Evidence "will generally contain reasonable but competing inferences of both discrimination and nondiscrimination that must be resolved by a jury." *Davis v. W. One Auto. Grp.*, 140 Wn. App. 449, 456, 166 P.3d 807 (2007). Courts will, however, grant summary judgment when the plaintiff fails to raise a genuine issue of fact on one or more prima facie elements. *See, e.g.*, *Hines v. Todd Pac. Shipyards Corp.*, 127 Wn. App. 356, 112 P.3d 522 (2005).

## II. Reasonable Accommodation

### A. The Duties of the Employer and Employee

¶14 WLAD requires an employer to reasonably accommodate an employee with a disability unless the accommodation would pose an undue hardship. RCW 49.60.180(2); *Pulcino v. Fed. Express Corp.*, 141 Wn.2d 629, 639, 9 P.3d 787 (2000), *overruled in part on other grounds by McClarty v. Totem Elec.*, 157 Wn.2d 214, 228, 137 P.3d 844 (2006).[6] A reasonable accommodation must allow the employee to work in the environment and perform the essential func-

---

[6] In 2007, the legislature amended WLAD to adopt a definition of "disability." *Johnson v. Chevron U.S.A., Inc.*, 159 Wn. App. 18, 28, 244 P.3d 438 (2010); Laws of 2007, ch. 317, § 2. The amendment is retroactive and applies to all causes of action occurring before July 6, 2006 and on or after July 22, 2007. Laws of 2007, ch. 317, § 3. The interim period constitutes the time between the Supreme Court's adoption of a definition in *McClarty* and the effective date of the amendment. *Hale v. Wellpinit Sch. Dist. No. 49*, 165 Wn.2d 494, 502, 198 P.3d 1021 (2009). *McClarty* remains good law only in that interim period.

The validity of *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 194, 23 P.3d 440 (2001), *Pulcino*, 141 Wn.2d at 643, *Riehl v. Foodmaker, Inc.*, 152 Wn.2d 138, 145, 94 P.3d 930 (2004), and *Davis v. Microsoft Corp.*, 149 Wn.2d 521, 532, 70 P.3d 126 (2003), has been questioned after the passage of the 2007 amendments to the definition of disability. *See Johnson*, 159 Wn. App. at 29. But, the cases are still good law for the propositions for which we cite them.

tions of her job without substantially limiting symptoms. *See, e.g.*, *Griffith v. Boise Cascade, Inc.*, 111 Wn. App. 436, 442, 45 P.3d 589 (2002). To accommodate, the employer must affirmatively take steps to help the employee with a disability to continue working at the existing position or attempt to find a position compatible with the limitations. *Id.* However, an employer is not required to reassign an employee to a position that is already occupied, create a new position, or eliminate or reassign essential job functions. *Pulcino*, 141 Wn.2d at 644.

B. The Dispute: Was the Attempted Accommodation Effective?

¶15 It is not disputed that, at the time of the facts giving rise to this case, Frisino had a medical condition that qualified as a disability.[7] Her disability is a physical impairment in the nature of respiratory sensitivity to molds, chemicals, and other environmental toxins. It is not disputed that environmental factors at Frisino's place of employment triggered physical symptoms that had a substantially limiting effect upon Frisino's ability to perform her job as a teacher. It is not disputed that, with an accommodation to remove those environmental triggers, Frisino was qualified to perform the essential functions of her job. Reassignment to a different type of job was not at issue. It is also not disputed that the District had notice of her disability and that the District attempted to accommodate that disability.

¶16 What is in dispute is whether the District's attempt at accommodation was effective in removing the cause of the substantially limiting symptoms. Did the District satisfy its obligation under the statute to reasonably accommodate Frisino?

---

[7] "Disability" means the presence of a sensory, mental, or physical impairment that either is the source of a substantial limitation or for which there is medical documentation indicating a reasonable likelihood that engaging in the job duties without accommodation would aggravate the impairment to the extent that it would create a substantially limiting effect. RCW 49.60.040(7); *Johnson*, 159 Wn. App. at 28. It is undisputed that Frisino's allegations fall in the first category: an impairment that is the source of a substantial limitation.

## C. Choice of the Mode of Reasonable Accommodation

¶17 Where multiple potential modes of accommodation exist, the employer is entitled to select the mode; the employee is not. *See Griffith*, 111 Wn. App. at 444. The employer then has the right to stand on its mode of accommodation, to the exclusion of other choices, if the accommodation is adequate. If the attempted accommodation is not adequate, the employer may attempt another mode of accommodation or assert that the remaining available modes of accommodation constitute an undue hardship. *Pulcino*, 141 Wn.2d at 639.

¶18 Nothing in the record establishes that the cleanup at Hale was an unreasonable mode of accommodation because it could not be achieved. And, Frisino initially requested either that Hale be cleaned or that she be transferred to a clean site, only later asserting that only a transfer would accommodate her. The District chose to attempt to clean up the Hale site. Liability turns on whether that effort was effective in removing the cause of the substantially limiting symptoms. If it was, the District reasonably accommodated Frisino at her current worksite and no transfer was required. But, if the clean-up was not effective, then the District was entitled to undertake additional efforts at accommodation, such as transfer, or to argue that additional accommodation efforts would have constituted an undue hardship.

## D. Trial and Error to Achieve Reasonable Accommodation

¶19 Generally, the best way for the employer and employee to determine a reasonable accommodation is through a flexible, interactive process. RCW 49.60.040(7)(d); *MacSuga v. Spokane County*, 97 Wn. App. 435, 443, 983 P.2d 1167 (1999). A reasonable accommodation envisions an exchange between employer and employee, where each party seeks and shares information to achieve the best match between the employee's capabilities and available positions. *See Goodman v. Boeing Co.*, 127 Wn.2d 401, 408-09, 899 P.2d

1265 (1995); RCW 49.60.040(7)(d) ("[A]n impairment must be known or shown through an interactive process to exist in fact."). The employer has a duty to determine the nature and extent of the disability, but only after the employee has initiated the process by notice. *Goodman*, 127 Wn.2d at 409. In addition, the employee retains a duty to cooperate with the employer's efforts by explaining the disability and the employee's qualifications. *Id.* at 408. A good faith exchange of information between parties is required whether the employer chooses to transfer the employee to a new position or to accommodate the employee in the current position.

¶20 In some cases, the employee's disability results in limitations that can be measured by an objective standard. For example, in *Griffith*, Griffith's doctor provided restrictions of standing or walking no more than 40 minutes at a time and lifting up to 15 pounds only occasionally to accommodate Griffith's polymyositis. 111 Wn. App. at 439. In *Davis*, Davis's restrictions required working no more than 8 hours a day and 40 hours a week to accommodate his hepatitis C. 149 Wn.2d at 525. In *McClarty*, McClarty's restrictions limited actions for " '[r]epeated push/pull,' " " '[r]epeated simple grasp,' " and " '[r]epeated fine manipulation' " to 33 percent of an 8 hour workday as an accommodation for his carpal tunnel syndrome. 157 Wn.2d at 218 (alterations in original). In such cases, the employer need only determine whether the proposed accommodation in fact meets the standard to determine that the accommodation was effective.

¶21 The District treats this case like those involving objective standards. It argues that as a result of removing the mold at Hale the indoor air was at least as clean as the outdoor air, and therefore Frisino was reasonably accommodated. The communications during the interactive process focused on what standard Vega would recognize as "clean."[8]

---

[8] Vega instructed the District that Frisino should be transferred to a mold free site or a known "clean" environment.

But, Frisino had sensitivities to multiple irritants. She could have returned to the classroom after the cleanup and still experienced substantially limiting symptoms triggered by something other than mold. If she exhibited such substantially limiting symptoms, the District would not have effectively accommodated her even if the environment were mold free. Therefore, evidence measuring mold levels in the classroom or building alone was not dispositive of whether the attempted accommodation was effective. This evidence did not entitle the District to summary judgment on reasonable accommodation. But, neither does this dispose of the issues in this case.

¶22 In cases where an objective standard is not available to measure whether an accommodation is effective, a good faith *Goodman* interactive process is especially important. During that process, the duty to accommodate is continuing. The employer may wish to test one mode of accommodation and then test another, if the first mode fails. Or, if the attempt to accommodate is not effective, one or more additional attempts may be undertaken. The statute does not limit the employer to only one attempt at accommodation, and we will not impose such a requirement. An employer's previously unsuccessful attempts at accommodation do not give rise to liability if the employer ultimately provides a reasonable accommodation. *See, e.g., Sharpe v. Am. Tel. & Tel. Co.*, 66 F.3d 1045, 1051 (9th Cir. 1995) (employer's offer of position that accommodated Sharpe's disability, which employee rejected, satisfied WLAD, regardless of whether previous transfer accommodated the employee's disability). Therefore, we will look to the effectiveness of the accommodation attempted as of the time the employer alleged it satisfied its obligation under WLAD or terminated further efforts.[9]

---

[9] Frisino contends that several previous actions by the District violated WLAD by failing to result in accommodation, such as failing to assist Frisino in the search for a transfer from Hamilton and transferring her to Hale. But, these actions are fairly characterized as attempts by the District to accommodate Frisino. We look only to the accommodation the District alleged was effective, the Hale cleanup, to determine whether the District met its obligations.

¶23 No objective measure had been agreed to or recognized in the course of the interactive process between the parties that would permit the District to determine that the cleanup effort had reached a level at which Frisino would be free from substantially limiting symptoms. Without such a standard, trial and error was appropriate and necessary.[10]

¶24 The District asserted at summary judgment that Frisino's final request, that she be transferred to a clean environment to see if it was satisfactory, was an undue hardship and that as matter of law trial and error is not required.

¶25 An employer may choose to make only one attempt at accommodation, but it risks statutory liability if that attempt is not effective and it cannot show that additional efforts are an undue burden. Whether trial and error is necessary, as part of the interactive process, to satisfy the employer's burden depends on the facts of the case. Trial and error is not an undue hardship as a matter of law. However, we do not rule out that, under facts not before us, trial and error may constitute an undue hardship to the employer or pose an unacceptable risk to the employee.

¶26 We do not reach the question of whether transferring Frisino to other locations in search of a suitable work environment would have been an undue hardship. The record on that point was not sufficiently developed below. Further, the District does not adequately assert that argument on appeal.

---

Moreover, Frisino's notice of claim and complaint alleged only a failure to accommodate her disability on or after November 30, 2004. The alleged deficiencies in accommodation prior to November 30, 2004 cannot provide a basis to reverse the summary judgment.

[10] Nothing in the record suggests that returning to the site as part of trial and error testing to determine whether the symptoms would recur was an unacceptable health risk; presumably the risk would have been lessened by the cleanup efforts.

## E. The Employee's Duty To Communicate

¶27 An employer must be able to ascertain whether its efforts at accommodation have been effective in order to determine whether more is required to discharge its duty. The employee therefore has a duty to communicate to the employer whether the accommodation was effective. This duty flows from the mutual obligations of the interactive process. *Goodman*, 127 Wn.2d at 408-09. To hold otherwise would be inequitable to the employer and would undercut the statute's goal of keeping the employee with the impairment on the job. Further, the employee must communicate this information while the employer still has an opportunity to make further attempts at accommodation. Providing information to the employer only after being discharged does not satisfy this duty; at that point, the opportunity for the employer to correct the deficiency has passed. And, it would create a liability trap for the employer that the statute does not intend.

¶28 Here, determining whether the accommodation was effective turned on information in Frisino's control: her physical reaction, or lack thereof, to the workplace environment. The District completed its first phase of the cleanup in December. It requested that Frisino return to work in January. At that point, the burden in the interactive process shifted to Frisino. She had a duty to return to the workplace to determine whether or not the substantially limiting symptoms were still triggered. She also had a duty to communicate the result to the District. The remaining question therefore is: Has Frisino established a question of fact about whether she returned to the workplace and experienced substantially limiting symptoms and communicated those facts to the District prior to her termination?

## F. Questions of Material Fact as to Reasonable Accommodation Exist

¶29 At summary judgment, Frisino relied on her declaration to establish that she had returned to the building

and experienced substantially limiting symptoms. However, nothing in the record indicates that she expressly communicated those facts to the District before being discharged. Therefore, whether a question of material fact exists depends on inferences drawn from the record. Frisino is entitled to all reasonable inferences from the evidence before the court at summary judgment.[11] *Scott v. Pac. W. Mountain Resort*, 119 Wn.2d 484, 487, 834 P.2d 6 (1992).

¶30 Beginning in January 2005, the District asserted several times that it was safe for Frisino to return to her classroom. Frisino responded that the classroom was not effectively remediated. Frisino's February 1 letter to Takeuchi notes painting on the ceiling tiles and a hole in her ceiling covered with plastic and duct tape. This supports an inference that Frisino had been in the classroom. On February 10, Frisino asserted that stachybotrys mold and other irritants existed in her classroom, stating, "I have a severe reaction to them." This supports an inference that she experienced substantially limiting symptoms after the December remediation. Her March 3 letter to Holland indicated that she continued to work. This supports an inference that Frisino had been at the workplace. Frisino's doctor's communications on March 11 and April 20 also told the District that Frisino needed a different environment and supported her request for a transfer. These communications between Frisino and the District raise at least two questions of fact: whether Frisino had returned to the work site and experienced substantially limiting symptoms and, if so, whether she communicated that the accommodation was ineffective to the District or put them on notice to inquire into those facts.

¶31 Because questions of fact remain, we reverse the grant of summary judgment on Frisino's reasonable accommodation claim.

---

[11] We do not weigh the evidence or resolve any existing factual issues. *Fleming v. Smith*, 64 Wn.2d 181, 185, 390 P.2d 990 (1964).

III. Retaliatory Discharge

¶32 Frisino next asserts the trial court erred in dismissing her claim of retaliatory discharge for complaining about unlawful discrimination under RCW 49.60.210. To establish a prima facie case of retaliation for a protected activity, Frisino must show that (1) she engaged in statutorily protected activity, (2) an adverse employment action was taken, and (3) there was a causal link between the employee's activity and the employer's adverse action. *Estevez v. Faculty Club of the Univ. of Wash.*, 129 Wn. App. 774, 797, 120 P.3d 579 (2005). If Frisino establishes a prima facie case, then the District may attempt to rebut the case by presenting evidence of a legitimate, nondiscriminatory reason for the employment decision. *Wilmot v. Kaiser Aluminum & Chem. Corp.*, 118 Wn.2d 46, 70, 821 P.2d 18 (1991). The burden then shifts back to Frisino, who can attempt to prove that the employer's reason is pretextual. *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 180-81, 23 P.3d 440 (2001). To survive summary judgment, Frisino need show only that a reasonable judge or jury could find that her disability was a substantial motivating factor for the District's adverse action. *Id.* at 185-87.

¶33 The District alleged a nondiscriminatory reason for her termination: her failure to return to work. But, an employee who is forced to permanently leave work for medical reasons may have been constructively discharged. *Korslund v. DynCorp Tri-Cities Servs., Inc.*, 156 Wn.2d 168, 180, 125 P.3d 119 (2005). If the fact finder determines that Frisino had returned to the work site, had experienced the symptoms of her disability, and reasonably communicated those facts to the District, then the attempted remediation efforts were ineffective. Discharge for failure to return to work under such facts would not be justified. Therefore, whether the District put forth a legitimate, nondiscriminatory reason for Frisino's termination remains a question of fact.

¶34 We reverse summary judgment on Frisino's retaliation claim.

#### IV. Attorney Fees

¶35 Frisino requested attorney fees and costs pursuant to RCW 49.60.030(2) and RAP 18.1. RCW 49.60.030(2) has been interpreted as granting parties a right to attorney fees on appeal. *See Allison v. Hous. Auth.*, 118 Wn.2d 79, 98, 821 P.2d 34 (1991). Frisino is the prevailing party in this appeal. If Frisino is ultimately successful below, we direct the trial court to determine the award of fees for this appeal as part of the cost of the suit.

¶36 The District's request for attorney fees and costs fails because it is not a prevailing party. RAP 18.1.

¶37 We reverse and remand.

GROSSE and LAU, JJ., concur.

Review denied at 172 Wn.2d 1013 (2011).