[No. 41955-6-II. Division Two. August 28, 2012.]

GARRETT HARRELL, *Appellant*, v. THE STATE OF WASHINGTON, *Acting Through the Department of Social and Health Services, Special Commitment Center*, ET AL., *Respondents.*

*Joan K. Mell* (of *III Branches Law PLLC*), for appellant.

*Robert M. McKenna, Attorney General,* and *Matthew T. Kuehn, Assistant,* for respondents.

¶1 JOHANSON, J. — Garrett Harrell sued the Washington Department of Social and Health Services (DSHS) for discrimination under state and federal law, claiming that as a matter of law, DSHS failed to reasonably accommodate his night blindness. The trial court denied his summary judgment motion and dismissed his federal claims, but it allowed trial of his state law claims. The jury found in DSHS's favor. Harrell appeals the trial court's denial of his summary judgment and new trial motions as well as its dismissal of his federal law claims. We affirm because issues of material fact existed to preclude summary judgment, sovereign immunity bars the federal law claims, and substantial evidence supports the jury's verdict.

## FACTS

¶2 Residential rehabilitation counselors provide 24-hour security at the McNeil Island Special Commitment Center (Center), a facility operated by DSHS that provides specialized mental health treatment for sexual offenders who are civilly committed as "sexually violent predators." Clerk's Papers (CP) at 605. On-call counselors are not permanent staff but instead may be summoned to fill any shift when permanent staff members are unavailable. When the Center hires on-call counselors, it offers them prescheduled rotating-monthly shifts or call-in shifts at times convenient for them. All counselors, including on-call counselors, are covered under a collective bargaining agreement (CBA) between the State and the public employees union. Under the CBA, Center supervisors scheduled counselors "sporadically and not in any particular permanent manner." Verbatim Report of Proceedings (VRP) (Mar. 8, 2011) at 343. Counselor schedule supervisor, Jack Gibson, gave on-call counselors the option to be prescheduled into the same shifts for one month and to then be rotated to another shift the following month, so on-call counselors were never prescheduled to the same shift two consecutive months. The Center believed the CBA prohibited prescheduling on-call

counselors to the same prescheduled shifts over consecutive months because that would constitute "repetitive" scheduling. VRP (Mar. 8, 2011) at 346.

¶3 In October 2006, Garrett Harrell interviewed for an on-call counselor position at the Center. Harrell told the interview panel, including Gibson, that although he suffered from night blindness,[1] he could work any of the three daily shifts. Gibson declined to hire Harrell because he perceived Harrell as too immature. Harrell applied for the same on-call counselor position in 2007, again indicating that he had vision issues. This time, Gibson hired Harrell as an on-call counselor, and Harrell began work on October 1, 2007.

¶4 Harrell successfully completed a new employee orientation. He then shadowed permanent counselors during different shifts on multiple occasions. On October 27, he worked a solo swing shift and realized that the dark areas along the outer perimeter of the Center created problems with his night blindness. The following day, Harrell worked a solo day shift and stayed to work the swing shift. Harrell had difficulty seeing during the swing shift, but he did not alert anybody to his issues.

¶5 On October 29, Harrell was scheduled to work the swing shift again, but because he had concerns with his ability to see certain areas along his assigned security zone, he talked to a supervisor, who directed Harrell to take his concerns to Gibson. On October 30, Harrell was scheduled to work swing shift again, but he felt working might jeopardize his safety; so, he called in to say he would not be coming in that day. Harrell spoke with Gibson by phone on October 31 and told him that though he had indicated during the job interview that his disability would allow him to work any on-call shift, he realized after working night hours that he could work only day shift. Harrell requested a reasonable accommodation—that Gibson assign him to the day shift or

---

[1] Harrell's condition is known as retinitis pigmentosa.

a kitchen position. Gibson told Harrell that he could not assign him to a kitchen position because counselors and kitchen personnel were of different classifications; and, Gibson could not preschedule Harrell exclusively to day shift because that would violate the terms of the CBA and would be unfair to other staff seeking the popular day shift. Gibson had prescheduled Harrell to work swing shifts during November, so Gibson instructed Harrell to call in sick to his prescheduled swing shift positions until Gibson could rearrange Harrell's schedule to accommodate him.[2]

¶6 Gibson then suggested that Harrell switch from prescheduled to call-in status so that he could call in to the on-site administrator daily and ask if the Center had any day shift openings. Gibson told Harrell that if he desired, he could work 40 hours a week calling in each day to check for day shift cancellations. Finally, Gibson directed Harrell to submit to him a letter explaining his medical needs and desired accommodation, as well as medical documentation of his disability. Gibson believed shifting Harrell to call-in status would allow him greater flexibility to work only day shifts and to enjoy a temporary reasonable accommodation pending his submission of paperwork that would initiate DSHS's formal determination of whether Harrell required a more permanent reasonable accommodation.

¶7 That same day, October 31, Gibson wrote an informational report to his supervisor, David O'Connor, detailing his conversation with Harrell, reflecting that Harrell desired to "be assigned only Day Shift or to work in the kitchen." CP at 68. Gibson never received the medical documentation he requested from Harrell; so, on November 9, Gibson left Harrell a voice mail again requesting the documentation. In litigation, Harrell produced a fax receipt showing that he had faxed the medical documentation to Gibson's fax number on November 1, though Gibson claims he never received it.

---

[2] Gibson's supervisor, David O'Connor, alerted Gibson that he could not have Harrell call in sick when Harrell was not actually sick.

¶8 On November 20, Lester Dickson, the Center's personnel management administrator, received a November 19 letter from Harrell's attorney, Sue Sampson. The letter explained that Harrell "found that he needs to work a daylight shift because of the night blindness" and that "he has provided you his doctor's statement attesting to his need for that accommodation." CP at 338. The letter asserted that Harrell "has been removed from the schedule and is now suffering a salary loss." CP at 338. The letter also asked what legal basis the Center had for declining to accommodate Harrell's disability. In addition, it stated that the Center must inform Harrell of other available positions that he could work with reasonable accommodation. Dickson attempted to contact Harrell the following day to follow up and left a message. On December 4, Gibson sent an e-mail to on-site administrators Mario Martinez and Hardy Awadjie, stating, "[W]e want to make every effort to make any day shift On-call assignments available to [Harrell]. If there is any need for [a counselor] for the Day shift, [Counselor] Garrett Harrell is to be called." CP at 70. The e-mail went on, "We will not create work for [Counselor] Harrell, but we do want to afford [Counselor] Harrell every opportunity to work up to 40 hours per week as is offered to regular On-calls." CP at 70. O'Connor reiterated Gibson's e-mail, advising on-site administrators that "the effort needs to be done to be able to give [Harrell] an opportunity to be able to work day shift." VRP (Mar. 14, 2011) at 946.

¶9 Dickson spoke with Harrell on December 5 and again requested Harrell to fax in his medical documentation. Harrell restated his desire to work day shifts only. Harrell also expressed interest in working as a cook or in human resources, but Dickson advised Harrell that he would need to apply separately to work in those departments. Harrell also told Dickson that he was no longer interested in working as a counselor at this point.

¶10 That same day, Harrell faxed to Dickson his medical documentation. The documentation stated that because of

his disability, "nighttime hours are not possible, but with the daytime hours, there are no work limitations." CP at 341. Based on Harrell's requests and documentation, Center employees understood that Harrell sought a reasonable accommodation of prescheduled day shifts. But Dickson believed that the Center could not schedule Harrell to permanent prescheduled day shifts because 42 U.S.C. §§ 12111-12117, Title I of the Americans with Disabilities Act of 1990 (ADA), and the CBA preclude an employer from displacing one employee in order to accommodate another. The Center did not have a vacant permanent day shift position in which to place Harrell, so the Center continued to let him call in for day shift openings.

¶11 Records show that on at least six occasions, on-site administrators called Harrell to offer him day shift work and either left a message or otherwise could not reach him. On-site administrator Mario Martinez telephoned Harrell on at least 15 separate days to offer him day shift work, but he never reached Harrell and just left messages. On December 18, Harrell returned a message left by on-site administrator Randy Pecheos, alerting Pecheos that he had a new telephone number. Pecheos advised Harrell that to find a day shift opening, he should call the Center "a couple hours before" the scheduled start of day shift because that would be when permanent staff would be calling in sick. VRP (Mar. 14, 2011) at 903.

¶12 Phone records show that in November and December 2007, Harrell called McNeil Island dozens of times, either to the Center or to the prison, where his father worked. In November, Harrell called McNeil Island during morning hours on just two days, both days well after the day shift had already begun. And records show that on just three December mornings did he phone the Center in the early morning, the time of day that Pecheos had advised Harrell he would be most likely to find a day shift opening.

¶13 In December 2007, Harrell filed an Equal Employment Opportunity complaint against the Center. On March

1, 2008, the complaint was transferred to the Washington Human Rights Commission (Commission), and his complaint stated that Harrell sought a day shift position. The Commission processed Harrell's complaint after one year and, ultimately, the Center declined to change its position on Harrell's accommodation.

¶14 In early 2009, the State mandated budget cuts at the Center. The Center laid off roughly 60 employees, permanent and on-call staff, including Harrell. Harrell had not worked a shift since October 2007 and had not called in for work since December 2007.

¶15 Harrell sued DSHS—which operates the Center—and Superintendent Henry Richards and Gibson, individually and in their official capacities. Harrell claimed that the defendants discriminated against him based on his disability, violating RCW 49.60.180, part of Washington's Law Against Discrimination (WLAD), as well as the ADA. He also claimed that they wrongfully terminated him, violating the WLAD and his constitutional rights under 42 U.S.C. § 1983.

¶16 DSHS sought summary judgment, and Harrell responded, seeking partial summary judgment in a cross motion, but the trial court denied the motions. Following both sides' presentation of evidence, DSHS filed a CR 50 motion for judgment as a matter of law on all claims. After briefing on the matter and hearing arguments, the trial court dismissed Harrell's ADA and § 1983 claims. The parties argued the remaining WLAD claims to the jury, and the jury found that Harrell failed to prove that DSHS, Gibson, or Richards had discriminated or retaliated against him.

¶17 Following the jury's verdict, Harrell moved for a new trial, claiming the jury contravened the law, evidence did not support the verdict, and the verdict failed to provide

substantial justice. Harrell appeals[3] the trial court's denial of his partial summary judgment motion, its order partially granting DSHS's motion, and its denial of his motion.

## ANALYSIS

### I. Harrell's Summary Judgment Motion on Reasonable Accommodation

¶18 Harrell asserts that DSHS failed to reasonably accommodate his disability as a matter of law, and thus the trial court should have granted his summary judgment motion because (1) DSHS essentially demoted Harrell by assigning him to call-in status, (2) DSHS did not provide an effective accommodation, and (3) DSHS failed to engage Harrell in an interactive process to reach a reasonable accommodation. But the trial court properly denied Harrell's motion for summary judgment because when the evidence is taken in a light most favorable to DSHS, genuine issues of material fact exist on the issue of reasonable accommodation.

### A. Standard of Review and Rules of Law

¶19 We review the denial of summary judgment de novo. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). Summary judgment is proper if pleadings, depositions, affidavits, and admissions, viewed in a light most favorable to the nonmoving party, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Pulcino v. Fed. Express Corp.*, 141 Wn.2d 629, 639, 9 P.3d 787 (2000), *overruled on other grounds by McClarty v. Totem Elec.*, 157 Wn.2d 214, 137 P.3d 844 (2006). In discrimination cases, summary judgment is often inappropriate because the WLAD mandates liberal construction. *Frisino v. Seattle*

---

[3] We solicited supplemental briefing that we found helpful in analyzing the issues here.

*Sch. Dist. No. 1*, 160 Wn. App. 765, 777, 249 P.3d 1044, *review denied*, 172 Wn.2d 1013 (2011).

¶20 An employer that fails to reasonably accommodate the sensory, mental, or physical limitations of a disabled employee discriminates under the WLAD unless the employer can demonstrate that such an accommodation would result in an undue hardship to the employer's business. *Pulcino*, 141 Wn.2d at 639. And an employer need not necessarily grant an employee's specific request for accommodation but, rather, an employer need only reasonably accommodate the disability. *Pulcino*, 141 Wn.2d at 643. An employer is not required to reassign an employee to a position that is already occupied, to create a new position, to alter the fundamental nature of the job, or to eliminate or reassign essential job functions. *Pulcino*, 141 Wn.2d at 644. And generally, whether an employer made reasonable accommodations or whether an employee's request placed an undue burden on the employer is a question of fact for the jury. *Pulcino*, 141 Wn.2d at 644.

¶21 A reasonable accommodation requires an employer to take " 'positive steps' " to accommodate an employee's disability. *Goodman v. Boeing Co.*, 127 Wn.2d 401, 408, 899 P.2d 1265 (1995) (quoting *Holland v. Boeing Co.*, 90 Wn.2d 384, 389, 583 P.2d 621 (1978)). To reach a reasonable accommodation, employers and employees should seek and share information with each other "to achieve the best match between the employee's capabilities and available positions." *Goodman*, 127 Wn.2d at 409. Where many potential modes of accommodation exist, the employer is entitled to select the mode; not the employee. *Frisino*, 160 Wn. App. at 779. A demotion or adverse transfer, or a hostile work environment, may amount to an adverse employment action. *Kirby v. City of Tacoma*, 124 Wn. App. 454, 465, 98 P.3d 827 (2004), *review denied*, 154 Wn.2d 1007 (2005).

## B. Discussion

¶22 Reasonable accommodation claims often involve disputed facts best left for a jury to decide. In *Frisino*, for

example, a teacher with a respiratory sensitivity to molds and other environmental toxins sought from her employer school district a reasonable accommodation—a move to a different classroom. 160 Wn. App. at 771. Frisino declined the school's offer to move her to one of the classrooms the district provided. *Frisino*, 160 Wn. App. at 771-72. The district then hired a toxicology consultant and mold removal company to identify the mold problem and remove mold from the building. *Frisino*, 160 Wn. App. at 772. Frisino, though, refused to return to work, claiming that the district's remediation measures failed to remove all the mold. *Frisino*, 160 Wn. App. at 774. The school district eventually terminated Frisino for failing to return to work. *Frisino*, 160 Wn. App. at 776. The trial court granted summary judgment in favor of the school district. On appeal, Division One of this court reversed the trial court's granting of summary judgment, noting that questions of fact remained, particularly, whether Frisino had returned to the school at any point after remediation and experienced mold-related symptoms; and if so, whether she communicated the ineffectiveness of the district's remediation accommodation in addressing her mold sensitivities. *Frisino*, 160 Wn. App. at 784.

¶23 Like *Frisino*, this case involves questions regarding whether an employer's accommodations were reasonable in the context of an employee's disability. These questions involved whether Harrell's removal from prescheduled swing shifts, and exemption from any night hours, to call-in status constituted a reasonable accommodation, and why Harrell could not work any shifts following his removal from the prescheduled calendar. Accordingly, both cases involved questions of fact such that they should survive summary judgment. Harrell still asserts that as a matter of law, the trial court improperly denied him summary judgment.

¶24 First, Harrell characterizes his status change from prescheduled to swing shifts in November 2007 to assigned

call-in status as a demotion, not a reasonable accommodation as a matter of law, because he wanted to work any shift so long as it was well lit. But Harrell did not ask to work any shift so long as it was well lit.

¶25 Harrell told Gibson that he sought a reasonable accommodation to the day shift or the kitchen. In the letter he sent that same day to his supervisor, O'Conner, Gibson reiterated his understanding that Harrell sought a day shift: "[Counselor] Harrell advised me that it would be unsafe for him to work in an environment without light due to his night blindness and wanted [to] be assigned only Day Shift or to work in the kitchen." CP at 68. Harrell's doctor provided documentation that "nighttime hours are not possible, but with the daytime hours, there are no work limitations." CP at 341. Even the letter from Harrell's attorney states, "[H]e needs to work a daylight shift because of the night blindness." CP at 338.

¶26 When viewed in a light most favorable to DSHS, genuine issues of material fact existed: What was the scope of Harrell's reasonable accommodation request? And did moving Harrell from a prescheduled swing shift schedule to call-in status constitute a demotion, as Harrell claims, or a reasonable accommodation, as the Center claims? These disputes of material fact are sufficient to sustain the trial court's denial of Harrell's summary judgment motion.

¶27 Gibson hired Harrell to work as an on-call counselor, a position with no promise of any prescheduled shifts. The official counselor position description describes the hours as "Intermittent" and "Non-Permanent." CP at 52. Upon hire, on-call counselors understand that they are expected to work any of the three shifts, and they have no expectation to work any set amount of hours, as on-call counselors work strictly on an as-needed basis.

¶28 But because of the high turnover and volume of permanent and on-call counselors required daily to staff the Center, Gibson prescheduled on-call counselors to certain shifts in order to staff the security detail. Gibson

prescheduled Harrell to work swing shifts in November 2007, and, upon learning that Harrell could not work night hours, Gibson removed him from the schedule and instead shifted his status from prescheduled on-call to call-in. Gibson explained that because he had already set the prescheduled on-call counselor schedule, he could not remove an on-call counselor prescheduled for day shift in order to accommodate Harrell for prescheduled day shift work. And the CBA prevented Gibson from permanently prescheduling Harrell to day shift. Again, these circumstances create a genuine issue of material fact regarding the scope of Harrell's reasonable accommodation request.

¶29 Second, Harrell claims that DSHS failed to provide him an effective accommodation because Gibson did not assign Harrell to available day shifts. But Gibson had already prescheduled other on-call counselors to the available November day shifts. And Gibson was not required to reassign another prescheduled counselor on the day shift in order to create a position for Harrell. *See Pulcino*, 141 Wn.2d at 644. Before learning that Harrell's disability would prevent his working night hours, Gibson prescheduled Harrell to the swing shift in November. Then, per Gibson's rotating on-call schedule, counselors prescheduled for swing shift in November would be prescheduled to work the graveyard shift in December and the day shift in January. Gibson could not easily or immediately assign Harrell to a day shift. Gibson arguably provided Harrell an opportunity to continue as a counselor, to avoid working swing and graveyard shifts, and to work only day shifts. Viewing the evidence in a light most favorable to DSHS, Gibson may have provided Harrell an effective accommodation, a genuine issue of fact that the jury was entitled to decide.

¶30 Third, Harrell claims that DSHS violated the law as well as its own policies when it failed to engage Harrell in an interactive process to reach a reasonable accommodation. But Gibson and Dickson spoke with Harrell

to acquire his medical records and set up a reasonable accommodation, and Center personnel reached out to Harrell to offer him day shift opportunities, even though Harrell was then a call-in counselor. Employees at DSHS contacted Harrell and, with Harrell's guidance, set up his reasonable accommodation. Viewing this evidence in a light most favorable to DSHS, a genuine issue of material fact exists whether DSHS failed to engage in an interactive process with Harrell to set up a reasonable accommodation.

¶31 Here, viewing the record in a light most favorable to the nonmoving party, genuine issues of material facts exist. Accordingly, the trial court properly denied Harrell's summary judgment motion.

## II. ADA CLAIMS

¶32 Harrell next claims that the trial court erred in dismissing his ADA claims because DSHS does not enjoy immunity from ADA claims brought in state court. He cites RCW 4.92.090 as waiving Washington's sovereign immunity to tort claims. But, RCW 4.92.090 does not expressly waive sovereign immunity, and its general language does not allow federal ADA claims against DSHS in state court.

### A. Standard of Review and Rules of Law

¶33 The Eleventh Amendment prohibits suits against unconsenting states in federal court. *Alden v. Maine*, 527 U.S. 706, 712, 732, 119 S. Ct. 2240, 144 L. Ed. 2d 636 (1999). And the "sovereign immunity" doctrine prohibits suits against unconsenting states in state court. *Alden*, 527 U.S. at 731-32. The one exception to these immunities is that Congress may subject an unconsenting state to suit in federal or state court "when it does so pursuant to a valid exercise of its § 5 [of the Fourteenth Amendment] power." *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 364, 121 S. Ct. 955, 148 L. Ed. 2d 866 (2001). Though Congress attempted to abrogate the states' Eleventh Amendment and

sovereign immunities when it passed the ADA, the Supreme Court held that it lacked authority to do so under the Fourteenth Amendment. *Garrett*, 531 U.S. at 374.

¶34 So, whether Washington maintains its sovereign immunity for purposes of Harrell's action here depends on whether it has waived this immunity to ADA claims in state court. And, "a waiver of sovereign immunity must be 'unequivocally expressed' in statutory text." *Fed. Aviation Admin. v. Cooper*, ___ U.S. ___, 132 S. Ct. 1441, 1448, 182 L. Ed. 2d 497 (2012). We construe ambiguities in the statutory language in favor of immunity, so as not to enlarge the Government's consent to be sued beyond what a fair reading of the text allows. *Cooper*, 132 S. Ct. at 1448. General statutory statements that a state has consented are insufficient. For example, in *Kennecott Copper Corp. v. State Tax Comm'n*, 327 U.S. 573, 578-79, 66 S. Ct. 745, 90 L. Ed. 862 (1946), the United States Supreme Court held that a Utah statute that subjected Utah to being sued in " 'any court of competent jurisdiction' " for tax recovery actions was not a "clear declaration" of Utah's consent to being sued in federal court. The Washington statute at issue here, RCW 4.92.090, uses similarly vague language.

## B. Discussion

¶35 Harrell brought his ADA discrimination claims against DSHS, and Gibson and Richards—in their official and individual capacities—under Title I of the ADA, claiming that they refused to reasonably accommodate him.[4] Specifically, Harrell asserts that Washington has expressly waived its sovereign immunity through RCW 4.92.090: "The state of Washington, whether acting in its governmental or proprietary capacity, shall be liable for damages

---

[4] Harrell does not brief the trial court's ruling dismissing his ADA claims against Gibson and Richards, individually, for failure to train or supervise. Therefore, as Harrell does not brief this issue, we do not address it. RAP 10.3(a)(6); *see Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

arising out of its tortious conduct to the same extent as if it were a private person or corporation." Harrell misplaces his reliance on this statute, though, as the statute's general language does not constitute an unequivocal expression purporting to waive sovereign immunity. *See Rains v. State*, 100 Wn.2d 660, 668, 674 P.2d 165 (1983) (holding that the general language of chapter 4.92 RCW does not waive Washington's sovereign immunity to tort claims).[5] The Washington Legislature, too, has waived Washington's sovereign immunity under certain federal causes of action, just not the ADA under RCW 4.92.090.[6] Unlike these statutes that expressly waive sovereign immunity to federal claims, the general language of RCW 4.92.090 does not expressly waive Washington's sovereign immunity to ADA claims filed in state court.

¶36 The trial court erred when it cited the *Eleventh Amendment* in dismissing Harrell's ADA claims. But the trial court did not err in its decision to dismiss the ADA claims because DSHS enjoyed *sovereign immunity* from ADA claims brought in state court. Because the trial court did not err in dismissing the ADA claims, and because we may affirm a trial court for any reason the record supports,

---

[5] Minnesota, in contrast, has expressly waived its sovereign immunity with regard to ADA claims in state court. *See* MINN. STAT. § 1.05, subdiv. 4 ("An employee, former employee, or prospective employee of the state who is aggrieved by the state's violation of the Americans with Disabilities Act of 1990, United States Code, title 42, section 12101, as amended, may bring a civil action against the state in federal court or in any other court of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of the act.").

[6] RCW 47.60.210 states, for example, in waiving sovereign immunity to Jones Act claims in state court, "The state consents to suits against the department by seamen for injuries occurring upon vessels of the department in accordance with the provisions of section 688, title 46, of the United States code." *See also* RCW 49.60.030(2) ("Any person deeming himself or herself injured by any act in violation of this chapter shall have a civil action in a court of competent jurisdiction to enjoin further violations, or to recover the actual damages sustained by the person, or both, together with the cost of suit including reasonable attorneys' fees or any other appropriate remedy authorized by this chapter or the United States Civil Rights Act of 1964 as amended, or the Federal Fair Housing Amendments Act of 1988.").

we affirm the dismissal order. *See Hendrickson v. King County*, 101 Wn. App. 258, 266, 2 P.3d 1006 (2000).

### III. CONSTITUTIONAL CLAIMS UNDER 42 U.S.C. § 1983

¶37 Harrell next claims that the trial court improperly granted DSHS's CR 50 motion for judgment as a matter of law and dismissed his two constitutional claims brought under 42 U.S.C. § 1983. Specifically, he claims that DSHS, Gibson, and Richards failed to train and supervise Center staff and that they retaliated against Harrell after he exercised his First Amendment rights in reporting unsafe lighting conditions at the Center. But Washington and its entities enjoy sovereign immunity from 42 U.S.C. § 1983 claims, while persons sued in their individual capacity enjoy qualified immunity.

### A. Standard of Review and Rules of Law

¶38 The sovereign immunity doctrine prohibits suits against unconsenting states in state court. *Alden*, 527 U.S. at 730. And while a state may waive its sovereign immunity and consent to suit under § 1983 in a state court, Washington has not done so. *Dunning v. Pacerelli*, 63 Wn. App. 232, 237 n.2, 818 P.2d 34 (1991), *review denied*, 118 Wn.2d 1024 (1992).

¶39 Similarly, suits against state officials in their official capacities are treated as suits against the state. *Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991). And state officials performing discretionary functions are shielded from liability for civil damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). Defendants may establish their entitlement to qualified immunity as a matter of law on a motion for summary judgment or for a directed verdict. *Walden v. City of Seattle*, 77 Wn. App. 784, 788, 892 P.2d 745 (1995).

¶40 In evaluating whether an individual enjoys qualified immunity, we apply the two-part *Saucier* test where, first, we decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). Second, if the plaintiff has satisfied the first part, we decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Saucier*, 533 U.S. at 201. Since *Saucier*, the Supreme Court has held that a reviewing court may apply *Saucier*'s two-part test in any order. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right. *Pearson*, 555 U.S. at 232. And, in fact, "[a]s the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986).

¶41 To qualify for First Amendment protection, an employee must show that his questionable speech is actually entitled to constitutional protection. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977). If a public employee speaks as a citizen on a matter of public concern, then the speech may be protected by the First Amendment. *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006). If the speech is not a matter of public concern, but rather private concern, then the employee's speech has no First Amendment protections. *Garcetti*, 547 U.S. at 418.

¶42 Whether speech relates to an issue of public concern is an issue for the trial court to determine as a matter of law. *Wilson v. State*, 84 Wn. App. 332, 341, 929 P.2d 448 (1996), *review denied*, 131 Wn.2d 1022, *cert. denied*, 522 U.S. 949 (1997). The content, form, and context of the speech, as revealed by the full record, bear on the court's decision about whether the speech touches on a public concern.

*Wilson*, 84 Wn. App. at 342. Also, the court should consider the speaker's intent and whether the speaker intended to raise an issue of public concern or simply intended to further a personal interest. *Wilson*, 84 Wn. App. at 342.

¶43 We must determine whether a plaintiff employee's speech touches on a matter of public concern. *See Connick v. Myers*, 461 U.S. 138, 147-48, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983). If a plaintiff establishes that her speech was a matter of public concern, then she must prove that such protected speech was a substantial or motivating factor resulting in an adverse employment action taken against her. *See Doyle*, 429 U.S. at 287. Individual personnel disputes do not amount to matters of public concern. *See Desrochers v. City of San Bernardino*, 572 F.3d 703, 710 (9th Cir. 2009).

### B. Analysis

¶44 Because DSHS, a state agency, enjoys sovereign immunity from § 1983 lawsuits, the trial court properly dismissed Harrell's civil rights claims against DSHS. *See Alden*, 527 U.S. at 730. Similarly, the trial court properly dismissed those claims levied against Gibson and Richards in their official capacities, as they too enjoyed immunity in those roles. *See Hafer*, 502 U.S. at 25. Whether Harrell's suit against Gibson and Richards, in their personal capacities, was shielded by their qualified immunity requires further analysis.

¶45 Harrell claims that the trial court erred in granting DSHS's motion dismissing his free speech claim on the grounds that the speech was not of public interest. He asserts that he reported unsafe lighting conditions on the outer perimeter at the Center—a matter of public concern, relating to the safety of employees, residents, and the general public, and that the Center used his protected speech as a substantial or motivating factor in its decision to remove him from the November 2007 schedule. But the

trial court correctly determined that Harrell raised the lighting concerns, not out of concern for public safety, but rather in the specific context of his asking for a personal reasonable accommodation.

¶46 Rather than alerting Center supervisors to deficient lighting as a public safety concern, Harrell simply told Gibson and Dickson that the Center's lighting was deficient such that *he* could not perform *his* counselor duties along the perimeter because of *his* night blindness. As Harrell raised an individual personnel dispute, he fails to carry his burden to demonstrate that his speech touched on a matter of public concern. *See Desrochers*, 572 F.3d at 710. Therefore, as a matter of law, the First Amendment does not protect Harrell's speech.[7] So, as Harrell's removal from the prescheduled calendar was not clearly contrary to his specific, constitutional rights, then Gibson and Richards enjoyed qualified immunity. *See Pearson*, 555 U.S. at 232.

IV. MOTION FOR A NEW TRIAL

¶47 Harrell next argues that the trial court improperly denied his motion for a new trial because the jury reached a verdict contrary to law.[8] But not only did Harrell improperly characterize the standard of review as de novo, substantial evidence supported the jury's verdict, and the trial court properly instructed the jury.

A. Standard of Review and Rules of Law

¶48 A strong policy favors the finality of judgments on the merits. *Stanley v. Cole*, 157 Wn. App. 873, 887,

---

[7] Moreover, if Harrell claimed the State retaliated against him when it removed him from his November 2007 prescheduled shifts, he would have to reconcile that argument with the fact that he asked that Gibson remove him from those shifts. If Harrell claims retaliation in the form of his termination, then he must explain why the State waited until February 2009 to terminate him.

[8] Harrell did not object to the jury instructions, and he now confines his argument relating to improper jury instructions to just one footnote without citation to authority or support in the record. Given the inadequate briefing, we do not analyze the propriety of the jury instructions. RAP 10.3(a)(6); *see Cowiche Canyon Conservancy*, 118 Wn.2d at 809.

239 P.3d 611 (2010). We review for an abuse of discretion the grant or denial of a motion for a new trial where the motion is not based on an allegation of legal error. *Edwards v. Le Duc*, 157 Wn. App. 455, 459, 238 P.3d 1187 (2010), *review denied*, 170 Wn.2d 1024 (2011). We review de novo a trial court's rejection of a motion for a new trial based on a question of law. *Ramey v. Knorr*, 130 Wn. App. 672, 686, 124 P.3d 314 (2005), *review denied*, 157 Wn.2d 1024 (2006).

 ¶49 Whether an employer has made a reasonable accommodation is generally a question of fact. *Johnson v. Chevron U.S.A., Inc.*, 159 Wn. App. 18, 31, 244 P.3d 438 (2010), *review denied*, 171 Wn.2d 1020 (2011). And so long as the facts articulated in the course of trial are based on substantial evidence and support the verdict, we cannot overturn the verdict. *Campbell v. ITE Imperial Corp.*, 107 Wn.2d 807, 817-18, 733 P.2d 969 (1987).

## B. Analysis

 ¶50 The question at trial was whether DSHS provided Harrell a reasonable accommodation. This issue involves questions of fact. *See Johnson*, 159 Wn. App. at 31. Therefore, we review for an abuse of discretion the trial court's rejection of Harrell's motion for a new trial. *See Edwards*, 157 Wn. App. at 459. And we will not overturn the jury's verdict so long as substantial evidence, viewed in a light most favorable to the defendants, supports the jury's verdict. *See Campbell*, 107 Wn.2d at 818.

¶51 Here, the jury heard evidence that Harrell confined his request strictly to day shifts at the Center; and he provided a doctor's note, his attorney's letter to the Center, and his own Human Rights Commission complaint, as well as the testimony of various witnesses who corroborated Harrell's request. Various employees and administrators at the Center—including Gibson, Richards, Dickson, O'Connor, and associate superintendent of resident programming and security operations Cathi Harris—testified that the Center

accommodated Harrell as an on-call counselor by offering to allow him to call in to work only day shifts. DSHS offered evidence, including Harrell's own admissions, that Harrell failed to take advantage of his reasonable accommodation and that he did not regularly call in to secure work or make himself available to work when the Center called him. Dickson, Gibson, and Harris each testified about why the Center could not provide Harrell a day shift on-call counselor position, as it would create an undue burden on the Center; and, prescheduling him to day shift as an on-call counselor would violate the CBA. Harrell even acknowledged that his request would be incompatible with the position for which he was hired. Given the strong policy favoring the finality of judgments on the merits and the substantial evidence supporting the jury's verdict, the trial court did not abuse its discretion in denying Harrell's motion for a new trial. *See Stanley*, 157 Wn. App. at 887; *Edwards*, 157 Wn. App. at 459.

## ATTORNEY FEES

¶52 Harrell seeks attorney fees and costs stemming from both trial and appeal. He bases his request on the WLAD, the Civil Rights Act, and the ADA. Under the WLAD, a person injured by any act in violation of his rights under the WLAD may recover attorney fees and costs. RCW 49.60.030. Similarly, a prevailing party may recover costs and attorney fees under federal law in civil rights matters. 42 U.S.C. §§ 1988, 12205. Because Harrell suffered no injury by any act in violation of the WLAD, and because he was not the prevailing party, we do not award Harrell attorney fees or costs.

¶53 We affirm.

WORSWICK, C.J., and HUNT, J., concur.

Review granted at 176 Wn.2d 1011 (2013).