# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

SARA HARTMAN,

                Appellant,

            v.

THE YOUNG MEN'S CHRISTIAN
ASSOCIATION OF GREATER
SEATTLE, d/b/a DALE TURNER
FAMILY YMCA,

            Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

NO. 71765-1-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: November 9, 2015

LAU, J. — Sara Hartman sued the YMCA under Washington's Law Against Discrimination (WLAD) alleging, among other claims,[1] that the YMCA (1) failed to accommodate her disability, (2) retaliated against her protected activity by implementing adverse employment actions, and (3) constructively discharged her by creating an intolerable work environment. The trial court granted the YMCA's summary judgment motion dismissing all of Hartman's claims. Because material issues of fact exist as to each of Hartman's claims, we reverse and remand for trial.

---

[1] Hartman does not appeal the dismissal of her disparate treatment and intentional and negligence claims.

FACTS

We view the facts in a light most favorable to Hartman. In March 2012, Sara Hartman began working as an assistant teacher at the Dale Turner Family Child Development Care Center (CDC), located in a North Seattle branch of the Young Men's Christian Association (YMCA). In May, Hartman experienced daily headaches. She also developed other symptoms, including coughing, burning eyes, and sinus and chest burning. Hartman suspected mold in the building's HVAC system caused these symptoms. On June 5, her husband Peter Hartman, a licensed HVAC specialist, inspected the system.

Peter[2] replaced many of the "filthy" air filters. Clerk's Papers (CP) at 431. He also noted the unit was in general disrepair and needed maintenance to address clogged air filters, clogged cooling coils, worn fan belts, and worn bearings. During his investigation, he photographed the general condition of the HVAC unit. He also noted the presence of mold. Peter determined that by taking care of the "air filters and air movement capabilities would help remedy the moisture situation in the unit." CP at 87. He explained that with improved air flow, mold "will just die out," except it does not remedy the existing mold. CP at 86-87. Peter informed Sarah Morris, the Regional Senior Program Director of Childcare for the YMCA, of his findings. Morris gave Peter the contact information of Bob Haskell, the senior building engineer.

On June 21, Peter e-mailed Haskell to alert him about the state of the HVAC and included the photographs. Soon after receiving the e-mail, Haskell investigated the HVAC at the CDC to determine what parts, if any, needed to be replaced. Earlier in

---

[2] For clarity, we use Peter Hartman's first name.

June, Haskell had investigated the units based on a report of an odd smell. Haskell ordered several new parts for the HVAC units. In mid to late July, Haskell and another maintenance employee tried to install the new parts into the HVAC system. But classes were in session which prevented installation.

By early August, more staff and children complained of negative health effects. On August 7, Sarah Morris e-mailed Haskell suggesting that Peter Hartman perform another inspection of the HVAC system:

> I need to act fast on getting the HVAC cleaned at the CDC. Children are going home with bloody noses, staff have bad headaches, and children are very cranky. There is a bad smell that is coming out of the system (reported to me by staff) . . . One of the teacher's husband [Peter Hartman] works at an . . . HVAC company . . . I can give them a call if you are swamped with Facility Improvement items. Just let me know. I need to put the staff and participant's health at the top of my priority list.

CP at 105.

Two months after his first inspection, Peter Hartman went to the CDC for a second inspection. He noticed many of the same problems remained from his first inspection—filters were still dirty and the belt was falling apart. Peter replaced the belt and noticed the mold he originally saw in June was still present. He took photographs and spoke with two teachers about his findings. He also sent an e-mail to CDC management listing all of the issues with the HVAC system, including the presence of mold. On August 9, Haskell forwarded Peter's e-mail to Mike Phillips, head of YMCA maintenance for the Greater Puget Sound region.

Around the same time, YMCA staff tried to fix the problem. Around August 8 or 9, Adam Wegener, a CDC maintenance worker, replaced several filters, vacuumed part of the HVAC unit, vacuumed the coils, and sprayed the coils with Lysol. On August 10,

Phillips inspected the HVAC units with two members of the maintenance staff. They cleaned the outside units, inspected the inside units, and replaced a bearing in one of the units.

On August 13, staff reported that the HVAC system was making a loud and unusual noise. Maintenance workers, Hayder Hussein and Jose Maldonado-Gonzales, checked the problem and thought it might be a grinding bearing that needed to be replaced.

According to Maldonado-Gonzales, Hartman screamed at him and Hussein for not fixing the problem with the HVAC system. Maldonado-Gonzales told Hartman that if she was concerned she should call his boss. Maldonado-Gonzales reported the incident to his supervisor. Other employees who witnessed the conversation described Hartman as disrespectful.

Hartman disagreed and disputed Maldonado-Gonzales' version. Hartman said she asked Maldonado-Gonzales and Hussein about whether they had used cleaning solution on the HVAC system. She denied engaging in a "disrespectful conversation." CP at 171. Latisha Davis, a lead teacher at the CDC, witnessed the conversation. "Sara Hartman supposedly was disrespectful to one of the maintenance men." CP at 159. Davis disagreed that Hartman was disrespectful or that she called the maintenance workers "liars." CP at160. Davis stated that Hartman "asked them a question and she questioned it. I don't think that's calling them a liar. I think that's questioning." CP at 398. According to Davis, Hartman questioned the maintenance workers about "a special something you have to use on the HVAC system that can't be used with kids present." CP at 160. Davis also explained, "there's a language barrier"

and questioned whether the workers "totally understood everything she was saying." CP at 162.

On August 13, the same day of the incident, Hartman e-mailed Morris and also left her a voicemail message reporting that several students had recurring health problems that may be related to mold exposure. On the voicemail, Hartman informed Morris that her doctor determined that Hartman's symptoms were likely due to mold exposure. The doctor referred Hartman to a specialist and suggested that Hartman avoid the contaminated area. Hartman also explained the incident with Hussein and Maldonado-Gonzales. On August 14, Hartman e-mailed Morris again, stressing CDC's need to address the HVAC problem:

> Because I have photos of mold in our HVAC units in this building, and because my doctor diagnosed me with exposure to an airborne contaminant yesterday I am truly not going to be comfortable working here and bringing my child here until I see photos of a clean HVAC unit . . . My priority here is simply that this is a safe building for the adults & children that spend their days here. Please allow me to ask Pete to volunteer another hour of his time to prove to me that the Y has followed through and removed the mold . . . My doctor told me that simply removing the contaminant from the air & being in a properly ventilated space will bring the same quick & lasting relief from my symptoms as when I am out of the building on weekends.

CP at 320.

Morris also received written complaints from three other employees regarding chronic illnesses including sinus infections and headaches. In the first letter, the employee states that "[S]ince beginning work at the CDC in October of 2010 I have had recurring sores in my nose as well as regular headaches." CP at 322. The employee noticed these negative health effects still occurred even after the CDC allegedly cleaned the HVAC system. The employee also noticed that the children attending the CDC

"cannot get better from illness/allergies" and that one child had been continually sick since January 2014. CP at 322. The employee wrote: "I am concerned for the children in this center as well as myself [and] coworkers' health. I would like this problem solved [a]s soon as possible!" CP at 323. Another employee wrote that she experienced chronic sinus infections "for many months starting last May." CP at 324. This is approximately the same time period when Hartman noticed her own symptoms. Lauren Bridges, another CDC employee, wrote that she had been sick for "the past handful of months." CP at 325. Like Hartman, Bridges explained that her symptoms typically worsened over time:

> I usually am fine when I first arrive in the morning but by mid morning I begin to experience a headache and nausea feeling that continues to get worse and worse throughout the day. Once I get home, it usually takes a few hours, but I am somewhat better and [then] fine in the morning. There have been a few times when it has been so bad that it continues overnight. It is slowly more and more affecting my work and outside life [because] I am with a headache and stomach[ache] everyday.

CP at 325. Bridges also noted that there was a "musty moldy odor" in the building that exacerbated her symptoms and that the odor remained "even after the workers were here working on it last week." CP at 325. Bridges also noticed that children were experiencing negative health symptoms:

> They are throwing up, having really bad stuffy noses and coughs and we send them home. The parents bring them back usually on Monday and say they were great over the weekend and then come Monday evening or Tuesday we are sending the poor kids home again. I have heard numerous parents say "I just don't understand why they are sick again, they were all better." I know the feeling because that is what happens to me.

CP at 325.

On August 15—the day after Hartman requested an accommodation—Sarah Morris placed Hartman on a Performance Improvement Plan (PIP) due to the alleged incident with Maldonado-Gonzales. The objective of a PIP is to coach a staff member. Andrea Mills, Hartman's immediate supervisor, arranged a meeting with Hartman, Morris, and Davis. Hartman and Davis believed the meeting was about the problems with the HVAC system. But instead the meeting was about Hartman's PIP. The PIP was directed at Hartman's allegedly disrespectful treatment of Maldonado-Gonzales. The plan required Hartman to remain respectful during "times of stress" and issue a written apology to those involved. CP at 171. If there was another incident, Hartman would be terminated. Hartman declined to sign the PIP, disagreeing that her comments were disrespectful. Davis testified that Morris discussed the HVAC issues and implied the issue was resolved: "Sarah Morris had said that there wasn't any mold. I do remember that. And everything had been [taken] care of." CP at 401.

On August 27, Sarah Morris e-mailed Andrea Mills regarding Hartman's work schedule. Specifically, Morris claimed that Hartman took her lunch breaks at the very end of her shift. Morris told Mills that Hartman needed to take her lunch break in the middle of the day instead of "recording time for lunch when she is actually leaving to go home." CP at 329. Mills said she would look into it and noted that staff would sometimes leave early if they had stayed later the day before. Mills testified that sometimes staff would leave early if they had appointments or other engagements:

> [Plaintiff's Counsel]: Okay. Do you know of any other staff members who would take their lunch hour at the end of their shift?
> [Mills]: I mean, sometimes staff would, I mean, if they had appointment or if they had to leave early, sometimes would

> postpone taking their lunch at their normal time and maybe take it later or, for example, leave a half an hour early if they had somewhere to go.
>
> [Plaintiff's Counsel]: And you didn't have any concern with them doing that?
>
> [Mills]: No, as long as it worked out with scheduling . . . .
>
> . . . .
>
> [Plaintiff's Counsel]: Did you receive any other e-mails from Sarah Morris about other employees logging their lunch breaks at the last 30 minutes of their shift?
>
> [Mills]: I don't, no.

CP at 554-56. On September 1, Morris e-mailed Mills again: "Sara [Hartman] has logged her 30 minute lunch/break every day again last week for the last 30 minutes of her shift. We need her to take her break in the middle of her shift not at the end. Can you please communicate that to her?" CP at 331.

Hartman points to two other alleged acts of retaliation. First, she claims that "the YMCA solicited negative feedback about Hartman from its registrar employees." Br. of Appellant at 12. Second, she claims that the YMCA removed her job duties when it instructed her to refrain from contacting the registrar regarding enrollment information for CDC children.

Part of Hartman's job required her to check-in students attending the CDC. Hartman was given a "do not admit" list consisting of students whose parents were tardy on tuition payments. Students on the list were denied admission to the CDC. Generally, if a registration issue arose, Hartman would contact either Mills or Morris.

Hartman began contacting the registrar directly. Two employees at the registrar's office, Lindsay Miller and Kim Young, questioned this action given the confidential student information involved:

Well, I believe I had asked Kim if this was normal for teachers to contact regarding like what would be a confidentiality thing for a parent, and she had had some similar interactions via the phone and email with her, with Sara Hartman, and I had learned that it is not normal and that some of it was phone conversations that we had, email conversations were a bit on the demanding side . . . .

. . . .

Sara Hartman just felt like she needed to know the information right then and that it was her responsibility and her job to know whatever she wanted to know.

CP at 514-15. Miller acknowledged a similar past practice by other teachers. Latisha Davis also acknowledged that teachers were never told not to send e-mails to the registrar regarding enrollment issues.

On September 4, Young and Miller sent an e-mail to Sarah Morris expressing their concern over Hartman's contacts with the registrar's office regarding student enrollment information. Hartman claims that "the YMCA solicited negative feedback" about her. Br. of Appellant, 12. Young and Miller's e-mail described Hartman as rude and accused her of making improper demands for enrollment information. Andrea Mills told Latisha Davis she, not Hartman, should contact Mills, instead of the registrar, about student enrollment information. Hartman viewed this change as a divestment of her job duties.

Finally, Hartman's daughter, Zoe, was placed on the "do not admit" list because Hartman failed to pay her tuition. Zoe was a CDC student before Hartman worked there. As of September, Hartman was behind by several months on tuition payments. The YMCA concedes that this was due to an administrative error. The parties dispute whether Hartman was contacted about the system's failure to process these tuition

payments. The Hartmans have missed tuition payments at least five times since March 2011 but without termination of Zoe's admission by the CDC.

On September 6, Hartman resigned from the CDC. She explained in a letter that the primary reasons for her resignation were the YMCA's failure to address the HVAC issue and the decision to place her daughter Zoe on the "do not admit" list.

In December 2013, Hartman sued the YMCA under WLAD alleging, among other claims not at issue here, (1) disability discrimination for failure to accommodate, (2) retaliation, and (3) wrongful constructive discharge. The trial court granted the YMCA's summary judgment motion and dismissed Hartman's claims. Hartman appeals.

## ANALYSIS

Hartman argues the trial court erred by granting summary judgment to the YMCA. The YMCA responds, asserting that Hartman fails to establish a prima facie case as to each of her claims.

### Standard of Review

Whether the trial court properly granted a motion for summary judgment is a question of law reviewed de novo. Frisino v. Seattle School Dist. No. 1, 160 Wn. App. 765, 776, 249 P.3d 1044 (2011). A trial court properly grants summary judgment when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c); see Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). We view all facts and reasonable inferences in the light most favorable to the nonmoving party. Elcon Constr., Inc. v. E. Wash. Univ., 174 Wn.2d 157, 164, 273 P.3d 965 (2012).

Lack of Accommodation Claim

A plaintiff alleging discrimination based on a lack of accommodation must show:

> (1) the employee had a sensory, mental, or physical abnormality that substantially limited his or her ability to perform the job;
>
> (2) the employee was qualified to perform the essential functions of the job in question;[3]
>
> (3) the employee gave the employer notice of the abnormality and its accompanying substantial limitations; and
>
> (4) upon notice, the employer failed to affirmatively adopt measures that were available to the employer and medically necessary to accommodate the abnormality.

Riehl v. Foodmaker, Inc., 152 Wn.2d 138, 145, 94 P.3d 930 (2004) (quoting Hill v. BCTI Income Fund-I, 144 Wn.2d 172, 193, 23 P.3d 440 (2001)); see also Washington Pattern Jury Instruction 330.30, Disability Discrimination—Reasonable Accommodation—Burden of Proof and Notes on Use; Washington Pattern Jury Instruction 330.34, Disability Discrimination—Reasonable Accommodation—Definition and Notes on Use.

Existence of Disability

Under the statute, disability "means the presence of a sensory, mental, or physical impairment that: (i) is medically cognizable or diagnosable; or (ii) exists as a record or history; or (iii) is perceived to exist whether or not it exists in fact." RCW 49.60.040(7); see also Johnson v. Chevron U.S.A. Inc., 159 Wn. App. 18, 28, 244 P.3d 438 (2010) ("An employee qualifies for reasonable accommodation if he or she has an impairment that substantially limits his or her ability to perform the job, or the employer has notice of the impairment and medical documentation establishes 'a reasonable

---

[3] The YMCA does not dispute proof of the essential functions element.

likelihood that engaging in job functions without an accommodation would aggravate the impairment to the extent that it would create a substantially limiting effect.'" (quoting RCW 49.60.040(7)(d)(ii)).

A failure to reasonably accommodate sensory, mental, or physical limitations of a disabled employee constitutes discrimination unless the employer can demonstrate that such accommodation would result in an undue hardship to the employer's business. Pulcino v. Fed. Express Corp., 141 Wn.2d 629, 644, 9 P.3d 787 (2000). The YMCA does not argue undue hardship. Instead, the YMCA contends that Hartman had no "substantially limiting" disability and thus no condition for which an accommodation was "medically necessary" and she provided no notice of her alleged disability.

Here, Hartman raises material issues of fact about whether she had a disability. In early August 2012, a doctor found Hartman suffered from respiratory problems due to exposure to toxic substances. In Frisino, we concluded a plaintiff with similar symptoms was disabled for purposes of the WLAD. Frisino, 160 Wn. App. at 778 ("Her disability is a physical impairment in the nature of respiratory sensitivity to molds, chemicals and other environmental toxins."). The same is true here.[4]

---

[4] Hartman assigns error to the trial court's oral ruling, in which it indicated that it would not consider Hartman's medical records for purposes of diagnosis and causation. The trial court's written ruling, however, indicates that it disregarded Hartman's medical records only for purposes of establishing causation. The trial court's oral ruling is irrelevant because its written ruling controls. "It must be remembered that a trial judge's oral decision is no more than a verbal expression of his informal opinion at that time. It is necessarily subject to further study and consideration, and may be altered, modified, or completely abandoned. It has no final or binding effect, unless formally incorporated into the findings, conclusions, and judgment." Ferree v. Doric Co., 62 Wn.2d 561, 566-67, 383 P.2d 900 (1963). In any event, because we reverse the trial court's order granting summary judgment, we need not address the trial court's decision to disregard Hartman's medical records.

In response, the YMCA argues that Hartman's symptoms did not substantially affect her ability to work and therefore cannot constitute a disability requiring accommodation. The YMCA claims that Hartman continued to work despite her symptoms and has failed to show "evidence of excessive absences." Br. of Resp't at 16. But the record shows that Hartman missed at least some days of work due to these symptoms. An e-mail from Sarah Morris noted that Hartman had been sick and "not worked much" during the last six days.

The YMCA also argues that any response to complaints from staff about the HVAC system is not evidence that it perceived Hartman as disabled. We disagree. The record shows that YMCA management suspected the HVAC and Hartman's health symptoms could be linked. An e-mail from Sarah Morris stated: "I need to act fast on getting the HVAC cleaned at the CDC. Children are going home with bloody noses, staff have bad headaches . . . ." CP at 105. Hartman need not show that the YMCA perceived or regarded her as disabled in order to satisfy this element. She need only show that she had "an impairment that substantially limit[ed] his or her ability to perform the job." Johnson, 159 Wn. App. at 28. This is typically a question of fact for the jury. Pulcino v. Fed. Express Corp., 141 Wn.2d 629, 642-43, 9 P.3d 787 (2000). The record shows material issues of fact as to whether Hartman suffered from a disability for purposes of the WLAD.

Notice to the Employer

The notice element is not a demanding requirement: "In order to satisfy the 'notice' element, an employee is not required to tell the employer about the full nature and extent of the disability, only that a disability requiring accommodation exists."

-13-

Sommer v. Dep't of Social and Health Services, 104 Wn. App. 160, 173, 15 P.3d 664 (2001); see also Holland v. Am. W. Airlines, 416 F. Supp. 2d 1028, 1034 (W.D. Wash. 2006) ("notice obligation under the WLAD is not onerous; it requires that an employee give 'simple notice' of his disability" (quoting Downey v. Crowley Marine Serv., Inc., 236 F.3d 1019, 1023 n.6 (9th Cir. 2001))).

The YMCA argues that Hartman failed to give sufficient notice. It characterizes most of Hartman's attempts to notify as merely requests to fix the HVAC system. But given the facts and circumstances discussed above, material issues of fact exist as to the notice element. There is circumstantial evidence from which a jury could reasonably infer that Hartman communicated her health concerns to the YMCA as early as June when her husband was first called in to inspect the HVAC system.

Nevertheless, Hartman's e-mail on August 14 supports the reasonable inference that she provided sufficient notice:

> [B]ecause my doctor diagnosed me with exposure to an airborne contaminant yesterday I am truly not going to be comfortable working here and bringing my child here until I see photos of a clean HVAC unit . . . My doctor told me that simply removing the contaminant from the air & being in a properly ventilated space will bring the same quick & lasting relief from my symptoms as when I am out of this building on weekends.

CP at 320. The YMCA's knowledge of the disability is a jury question.

Duty to Reasonably Accommodate the Disability

In Goodman v. Boeing Co., 127 Wn.2d 401, 899 P.2d 1265 (1995), the Supreme Court addressed when an employer's duty to accommodate an employee is triggered. There, the court stated that this duty arises when the employer becomes aware of the employee's disability and limitations. Goodman, 127 Wn.2d at 408. "Once the

-14-

employee has met his or her burden of providing the employer with notice of the disability, the employer is required to take 'positive steps' to accommodate the disability. The employee is not required to inform the employer of 'the full nature and extent of the disability.'" Martini v. Boeing Co., 88 Wn. App. 442, 457, 945 P.2d 248 (1997) (citations omitted). Once notice is given, the employer has a duty to inquire regarding the nature and extent of the disability, while the employee has a duty to cooperate with the employer's efforts by explaining the employee's disability and qualifications. Goodman, 127 Wn.2d at 408-09; Hume v. American Disposal Co., 124 Wn.2d 656, 880 P.2d 988 (1994).

An employer has a duty to take affirmative steps to help a disabled employee continue working in his or her existing position or find a new position compatible with the employee's disability. Griffith v. Boise Cascade, Inc., 111 Wn. App. 436, 442, 45 P.3d 589 (2002). But the employer has broad discretion in choosing how it accommodates an employee's disability. "Where multiple modes of accommodation exist, the employer is entitled to select the mode; the employee is not." Frisino, 160 Wn. App. at 779. An employer can implement a "trial and error" process and may continue to adopt new methods of accommodation if some methods are ineffective. Frisino, 160 Wn. App. at 779-80. In Frisino, we explained that the most important requirement is that the employer and the employee engage in a good-faith, interactive process so that the employer can determine an appropriate way to accommodate the employee's needs:

> In cases where an objective standard is not available to measure whether an accommodation is effective, a good faith . . . interactive process is especially important. During that process, the duty to accommodate is continuing. The employer may wish to test one mode of accommodation and then test another, if the first mode fails. Or, if the

attempt to accommodate is not effective, one or more additional attempts may be undertaken. The statute does not limit the employer to only one attempt at accommodation, and we will not impose such a requirement. An employer's previously unsuccessful attempts at accommodation do not give rise to liability if the employer ultimately provides a reasonable accommodation.

Frisino, 160 Wn. App. at 781.

Although the record shows that the YMCA attempted to accommodate Hartman, she raises material issues of fact as to whether the accommodations were reasonable. The record shows that the YMCA responded to the HVAC problem by (1) allowing Hartman's husband to inspect the system in June, (2) directing Bob Haskell to inspect the system and order replacement parts in June, (3) allowing Hartman's husband to perform a second inspection in August, and (4) having its own employees perform some maintenance on at least two instances between August 8 and 13. By mid-October, employees were no longer suffering any symptoms. A mold test near the end of October revealed no mold.

Whether the YMCA accommodated Hartman's alleged disability is ultimately a question of reasonableness. Frisino, 160 Wn. App. at 779-80. As Frisino indicates, an employer has some discretion when it attempts to accommodate a disabled employee. The employer can continue to adopt different accommodation methods that may or may not be successful. As long as the employer takes affirmative remedial steps and engages in a good faith "trial and error" process to accommodate the employee, it probably cannot be held liable for a failure to accommodate. Frisino, 160 Wn. App. 160 Wn. App. at 779.

But taking some remedial steps does not shield the employer from liability. For instance, like Hartman, the plaintiff in Frisino suffered respiratory symptoms from mold or other environmental contaminants. Frisino, 160 Wn. App. at 778. The school district attempted to accommodate this disability by inspecting and cleaning her classroom and the air system. Frisino, 160 Wn. App. at 783. Despite these efforts, we concluded that summary judgment in favor of the employer was improper because the plaintiff left work and was discharged before the employer could determine whether its efforts remedied the problem. Frisino, 160 Wn. App. at 784.

The YMCA argues that it was unable to determine whether its attempts to accommodate were successful because Hartman left before the HVAC issue was resolved. If Hartman had remained on the job or taken a leave of absence like the plaintiff in Frisino, she may have found relief by mid-October, as other employees did.

But contrary evidence in the record indicates that the YMCA believed it had addressed the issue and therefore ceased any attempt to accommodate Hartman. Latisha Davis testified that, during the August 15 meeting to address Hartman's PIP, "Sarah Morris had said that there wasn't any mold. I do remember that. And everything had been [taken] care of." CP at 401. Indeed, the record shows the YMCA performed no maintenance or inspection after August 13 until late September. In an e-mail on September 20, Mike Phillips mentions the August "visit" to check the air system, and notes that "that has been the only time we have serviced the equipment." CP at 135. Adam Wegener stated that he vacuumed part of the system. It remains unclear whether this work was completed when he checked on the system in early August or sometime after.

Further, the record raises questions as to the YMCA's motive for fixing the HVAC system in September. The record indicates an employee filed a complaint with the State licensing authority about the CDC. That complaint rather than Hartman's disability may have prompted YMCA staff to perform inspections and cleanings in late September and early October and explains why they tested for mold at the end of October.

Whether an employer has made a reasonable accommodation is generally a question of fact for the jury. Johnson, 159 Wn. App. at 32. So it is here. Viewing the facts and circumstances here in the light most favorable to Hartman, she raises material issues of fact as to whether the YMCA reasonably accommodated her disability. Given the evidence presented on summary judgment, a jury could find either that the YMCA took reasonable actions to accommodate Hartman or that it fell short of its duty to reasonably accommodate her disability.

Retaliation Claim

The YMCA asserts that Hartman fails to establish protected activity, an adverse employment action, and causation.

To prevail on this claim, Hartman must establish a prima facie case of retaliation. Wilmot v. Kaiser Aluminum and Chemical Corp., 118 Wn.2d 46, 68, 821 P.2d 18 (1991). To establish a prima facie case of retaliation under the WLAD, Hartman must show (1) she engaged in statutorily protected activity, (2) the YMCA took some adverse employment action against her, and (3) there is a causal link between her protected activity and the YMCA's adverse action. Alonso v. Qwest Community Co., LLC, 178 Wn. App. 178 Wn. App. 734, 745 (2013).

Washington courts have adopted the McDonnell-Douglas/Burdine three-part burden allocation framework for disability discrimination claims and retaliation claims. McDonnell-Douglas Corp. v. Percy Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); Texas Dep't. of Cmty. Affairs v. Burdine, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed.2d 207 (1981). Under the McDonnell-Douglas/Burdine framework, Hartman has the initial burden to prove a prima facie case. If she establishes a prima facie case, the burden shifts to the YMCA to present evidence of a legitimate, non-discriminatory reason for its actions. The burden then shifts back to Hartman to produce evidence that the YMCA's asserted reason for the adverse employment action is merely a pretext. Amica v. Wal-Mart Stores, Inc., 120 Wn. App. 481, 488, 84 P.3d 1231 (2004). Hartman carries the ultimate burden at trial to prove that discrimination or retaliation was a substantial factor in the adverse employment actions. But to survive summary judgment, Hartman need only show that a reasonable jury could find Hartman's repeated requests for accommodation was a substantial motivating factor for the YMCA's adverse employment actions. Hill v. BCTI Income Fund—I, 144 Wn.2d 172, 185-87, 23 P.3d 440 (2001) (Hill II); Wilmot, 118 Wn.2d at 71-72.

Protected Action

The record shows sufficient facts to establish Hartman engaged in protected activity. Requesting an accommodation for a disability is a protected action under the WLAD. Hansen v. Boeing Co., 903 F. Supp. 2d 1215, 1218 (W.D. Wash. 2012).[5] Under the circumstances here, a jury could reasonably conclude that Hartman's request

---

[5] Washington courts look to federal case law in interpreting the WLAD. Kumar v. Gate Gourmet, Inc., 180 Wn. 2d 481, 491, 325 P.3d 193 (2014).

that the YMCA fix the HVAC issue to remedy her respiratory symptoms constitutes a protected action. The YMCA argues that (1) Hartman did not request an accommodation and (2) her complaints do not amount to protected activity because she was unaware of the YMCA's efforts to remedy the problem. But the record shows that Hartman did request an accommodation. Further, whether Hartman knew about the YMCA's efforts is irrelevant—the only relevant question is whether she engaged in protected activity. A request for an accommodation is protected under the WLAD.

Adverse Employment Action

The record also establishes that Hartman raised a genuine material issue of fact as to whether she experienced an adverse employment action.

"An actionable adverse employment action must involve a change in employment conditions that is more than an 'inconvenience or alteration of job responsibilities,' such as reducing an employee's workload and pay." Tyner v. State, 137 Wn. App. 545, 564, 154 P.3d 920 (2007) (quoting Kirby v. City of Tacoma, 124 Wn. App. 454, 465, 98 P.3d 827 (2004)). Whether an action "is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position.'" Tyner, 137 Wn. App. at 565 (quoting Burlington North. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 2417, 165 L. Ed. 2d 345 (2006)).

Viewing the evidence in a light most favorable to Hartman, there is sufficient evidence of several allegedly adverse employment actions: (1) the failure to accommodate her disability, (2) the PIP, (3) alteration of her work schedule, (4) the

negative feedback from two registrar staff members, (5) her daughter's removal from childcare, and (6) constructive discharge.

Hartman has raised genuine issues of fact as to whether these actions constitute adverse employment actions. Whether a particular action would be viewed as adverse by a reasonable employee is a question of fact appropriate for a jury. Boyd v. State Dep't of Social and Health Servs., 187 Wn. App. 1, 349 P.3d 864 (2015). For example, reasonable minds could differ as to whether Hartman's PIP and her daughter's removal from childcare constitute adverse employment actions. See, e.g., Burchfiel v. Boeing Corp., 149 Wn. App. 468, 483, 205 P.3d 145 (2009) (noting that a "corrective action memo," similar to a PIP, could constitute an adverse employment action). We express no opinion as to whether these employment actions, taken individually, constituted adverse employment actions as a matter of law. However, taken in context, a reasonable jury could find that these actions, taken together, were materially adverse.

Causation

To dispute these allegedly adverse employment actions, the YMCA offers a non-retaliatory explanation for each action. But because the record supports both discriminatory and nondiscriminatory reasons for the adverse employment actions, we conclude the trial court erred when it granted summary judgment in favor of the YMCA.

To prove causation, Hartman need not show that retaliation was the sole motive, but she must demonstrate that it was a substantial factor. Allison v. Housing Auth. of City of Seattle, 118 Wn.2d 79, 95-96, 821 P.2d 34 (1991). Temporal proximity alone is not sufficient to show causation. Tyner, 137 Wn. App. at 565. But proximity in time between the protected activity and the adverse action may be a factor the court

considers. Burchfiel, 149 Wn. App. at 482; see also, Campbell v. State, 129 Wn. App. 10, 23, 118 P.3d 888 (2005) ("Proximity in time between the adverse action and the protected activity, along with evidence of satisfactory work performance, suggests an improper motive.").

Evidence in the record supports the inference that the YMCA's actions constitute retaliation sufficient to overcome summary judgment dismissal. First, the temporal proximity between Hartman's complaint and the allegedly adverse employment actions is relevant here. Although Hartman suggested the YMCA address the HVAC issue in June, she wrote several times to management urging them to fix the problem in early August. August is also the month when most of the adverse actions took place. She was placed on a PIP two days after her e-mail. A text message between YMCA staff links the PIP with Hartman's e-mail:

> Yeah, I've been keeping Keri up to date [on Sarah Hartman]—playing voicemails and all! I plan to do a PIP with Sara. FYI the latest is she went to her [doctor] today and was diagnosed with symptoms of mold exposure—she now has an [appointment] with a specialist . . .

CP at 369. In mid to late August, Morris noticed Hartman had been taking her breaks at the end of her shifts and sought to put an end to that pattern. August was also the month when the automatic payment system for her daughter's tuition failed, leading to Zoe's removal from childcare. Finally, a series of events in August led to the September 4 e-mail from two registrar employees stating that Hartman had been disrespectful to them and was requesting confidential information. Notably, the YMCA does not dispute that Hartman was a satisfactory employee. In fact, both Latisha Davis and Andrea Mills

provided extremely positive accounts of Hartman's work ethic and ability in their depositions.

Other evidence raises questions as to whether retaliation may have been a factor. For instance, Latisha Davis, like Hartman, also disagreed with the YMCA's conclusion that Hartman had been disrespectful to maintenance employees. Further, Davis testified that retaliation may have been a factor in the YMCA's decision to remove Zoe from childcare: "I felt the way it was handled was a little spiteful . . . . Like, for instance, calling her husband and not calling her until after it [the tuition] was already past due for two months." CP at 405.

Once an employee establishes a prima facie case, however, the burden shifts to the employer "to articulate a legitimate, nondiscriminatory reason for the adverse employment action." Scrivener, 181 Wn.2d 439, 446, 334 P.3d 541 (2014). Accordingly, the YMCA argues that each of these allegedly adverse actions has a legitimate, nondiscriminatory explanation.

The YMCA argues that several witnesses to the confrontation between Hartman and maintenance staff testified that Hartman was disrespectful. Therefore, the PIP was justified. The YMCA also argues the events leading to Zoe's removal from childcare indicates both administrative error and Mr. Hartman's failure to respond to the YMCA's notifications about failed payments.

Despite the YMCA's explanations, summary judgment is improper if sufficient disputed evidence establishes either that the YMCA's articulated reasons are pretextual or retaliation was nevertheless a substantial factor motivating the adverse employment actions. See Scrivener, 181 Wn.2d at 448. As our Supreme Court explained, the

existence of a legitimate, nondiscriminatory explanation does not foreclose the possibility of an improper purpose:

> An employee does not need to disprove each of the employer's articulated reasons to satisfy the pretext burden of production. Our case law clearly establishes that it is the plaintiff's burden at trial to prove that discrimination was a substantial factor in an adverse employment action, not the only motivating factor . . . An employer may be motivated by multiple purposes, both legitimate and illegitimate, when making employment decisions and still be liable under the WLAD.

Scrivener, 181 Wn.2d at 447.

Here, the record establishes the existence of both discriminatory and nondiscriminatory inferences from the evidence. For instance, even though several witness statements support the YMCA's decision to place Hartman on a PIP, both Hartman and Davis disagreed with the YMCA's characterization of events. Davis also testified that the YMCA's actions culminating in Zoe's dismissal from the CDC was "spiteful." CP at 405. Further, Morris decided to put Hartman on a PIP the same day Hartman sent her an e-mail notifying her of her disability and requesting that the HVAC issue be resolved. Although some of this evidence is circumstantial, it is nevertheless sufficient to survive summary judgment, particularly given the difficulty of proving an employer's motivation. See Wilmot, 118 Wn.2d at 69 (noting that an employee may rely on circumstantial evidence because "[p]roof of the employer's motivation may be difficult for the employee to obtain."). Under these facts, summary judgment was improper. See Burchfiel, 149 Wn. App. at 483 ("it is the jury's job to choose between inferences when the record contains reasonable but competing inferences of both discriminatory and nondiscriminatory actions.").

<u>Constructive Discharge Claim</u>

Finally, Hartman alleges that the YMCA created an intolerable work environment amounting to constructive discharge. She relies on the same facts discussed above to support her constructive discharge claim.

Constructive discharge occurs when the employer deliberately creates intolerable conditions forcing the employee to quit. <u>Korslund v. Dyncorp Tri-Cities Servs.</u>, 156 Wn.2d 168, 179, 125 P.3d 119 (2005), <u>overruled on other grounds by Rose v. Anderson Hay & Grain Co.</u>, No. 90975-0, 2015 WL 5455681 (Wash. Sept. 17, 2015). To prove constructive discharge, the plaintiff must demonstrate (1) the employer engaged in deliberate conduct which made the employee's working conditions intolerable; (2) that a reasonable person in the employee's position would be forced to resign; and (3) that the employee resigned because of the intolerable conditions. <u>Allstot v. Edwards</u>, 116 Wn. App. 424, 433, 65 P.3d 696 (2003).

Summary judgment on this claim was improper. The same disputed factual issues present in Hartman's other claims, discussed above, apply equally to her constructive discharge claim. For example, a jury could conclude that failure to accommodate Hartman's health condition and retaliatory conduct created intolerable working conditions that would force a reasonable person to resign. As with Hartman's other claims, reasonable minds could differ as to whether the YMCA retaliated against Hartman and failed to reasonably accommodate her condition. "Generally, whether working conditions have risen to an 'intolerable' level is a factual question for the jury." <u>Sneed v. Barna</u>, 80 Wn. App. 843, 849, 912 P.2d 1035 (1996).

The YMCA relies heavily on Sneed to support its argument that summary judgment was proper here. Sneed is inapposite. In Sneed, a former school principal was moved to an administrative position for two months, occupied a smaller office, and was asked to help register students on the first day of school. Sneed, 80 Wn. App. at 850. The court affirmed summary judgment in favor of the employer because the plaintiff received the same salary, only worked in the new position for a brief period of time, and apparently had done some of the same tasks in her prior position, including registering students. Sneed, 80 Wn. App. at 850. The facts in Sneed bear no similarity to the facts in this case. Here, Hartman alleged that her work environment caused her severe health issues. In Korslund, the court specifically noted that an ongoing health concern could amount to constructive discharge: "We agree that an employee who is forced to permanently leave work for medical reasons may have been constructively discharged." Korslund, 156 Wn.2d at 180. Combined with other factors—the PIP and Zoe's removal from childcare—reasonable minds could differ on whether Hartman's working conditions were intolerable.

## CONCLUSION

Viewing the facts and all reasonable inferences in the light most favorable to Hartman, there are genuine issues of material fact underlying each of her claims.

Accordingly, we reverse the trial court's order granting summary judgment in favor of the YMCA and remand for trial.

WE CONCUR: